Duane S. Horning (Bar No. 174995)
DHorning@CBLG.biz
CALIFORNIA BUSINESS LAW GROUP, PC
1935 Alpine Boulevard, Building C
Alpine, CA 91901
Telephone: (619) 325-1555

Attorneys for Plaintiffs GILBERT W. LEE,
M.D.; CALIFORNIA INSTITUTE OF
PLASTIC AND RECONSTRUCTIVE
SURGERY, A MEDICAL CORPORATION, a
California corporation dba Changes Plastic
Surgery & Spa; and INSPIRATIO LLC, a
California limited liability company

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT W. LEE, M.D.; CALIFORNIA INSTITUTE OF PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL CORPORATION, a California corporation dba Changes Plastic Surgery & Spa; and INSPIRATIO LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES CHAO; GEORGE SCOPETTA; PPS MSO HOLDINGS LLC, a Delaware limited liability company dba Prime Aesthetics Group; PPS FA LLC, a Delaware limited liability company; PRIME PLASTIC SURGERY ASSOCIATES CORP., a California professional corporation; and PRIME PLASTIC SURGERY MANAGEMENT LLC, a Delaware limited liability company,<br><br>Defendants. | CASE NO. **'24 CV 2292 RSH DEB**<br><br>COMPLAINT FOR VIOLATION OF SECURITIES EXCHANGE ACT OF 1934 AND SECURITIES AND EXCHANGE COMMISSION RULE 10b-5; VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAW OF 1968; TREBLE DAMAGES; FRAUD – INTENTIONAL MISREPRESENTATION; FRAUD – FALSE PROMISE; FRAUD – CONCEALMENT; NEGLIGENT MISREPRESENTATION; RESCISSION; BREACH OF FIDUCIARY DUTY; AND DECLARATORY RELIEF – UNLAWFUL CORPORATE PRACTICE OF MEDICINE<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs GILBERT W. LEE, M.D., CALIFORNIA INSTITUTE OF

PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL

CORPORATION, a California corporation dba Changes Plastic Surgery & Spa, and

COMPLAINT

INSPIRATIO LLC, a California limited liability company, bring this complaint and allege as follows:

**PARTIES**

1.     Plaintiff GILBERT W. LEE, M.D. ("**Lee**") is a physician licensed by the State of California and an individual residing in San Diego County, California.

2.     Plaintiff CALIFORNIA INSTITUTE OF PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL CORPORATION is a California corporation doing business as Changes Plastic Surgery & Spa ("**Changes**") in San Diego, California. Lee is the founder, sole shareholder, and officer of Changes.

3.     Plaintiff INSPIRATIO LLC, is a California limited liability company ("**Inspiratio**") doing business in San Diego, California. Lee is the sole member and manager of Inspiratio. Dr. Lee, Changes, and Inspiratio are collectively referred to herein as "**Plaintiffs**."

4.     Plaintiffs are informed and believe Defendant JAMES CHAO ("**Chao**") is an individual residing in San Diego County, California.

5.     Plaintiffs are informed and believe Defendant GEORGE SCOPETTA ("**Scopetta**") is an individual residing in San Diego County, California, and Florida.

6.     Defendant PPS MSO Holdings LLC is a Delaware limited liability company doing business as Prime Aesthetics Group ("**Holdings**"). Plaintiffs are informed and believe Holdings' principal office is in Huntington Beach, California. Plaintiffs are informed and believe Chao and Scopetta are the founders and sole Managing Members of Holdings.

7.     Defendant PPS FA LLC is a Delaware limited liability company ("**PPS FA**"). Plaintiffs are informed and believe PPS FA's principal office is in Miami, Florida.

8.     Defendant PRIME PLASTIC SURGERY ASSOCIATES CORP. is a California professional corporation ("**Associates**"). Plaintiffs are informed and believe Associates' principal office is in La Jolla, California.



2

9.     Defendant PRIME PLASTIC SURGERY MANAGEMENT LLC is a Delaware limited liability company ("**Management**"). Plaintiffs are informed and believe Management's principal office is in Huntington Beach, California.

10.    Chao, Scopetta, Holdings, PPS FA, Associates, and Management are collectively referred to herein as "**Defendants**." Each of the Defendants was an agent and acted on behalf of each of the other Defendants with respect to the matters alleged herein.

11.    At all relevant times, Chao and Scopetta owned, managed, or otherwise controlled Holdings, PPS FA, and Associates. Holdings owned and controlled Management from its inception until on or about July 29, 2024, when White Oak Global Advisors, LLC ("**White Oak**") acquired all of Holdings' membership interests in Management at a foreclosure sale.

12.    On information and belief, Defendants have disregarded any separateness among themselves; funds and other assets of Defendants have been co-mingled; individual Defendant's funds have not been segregated from those of one another; Defendants have treated each other's assets as their own; Defendants have diverted each other's funds for other than their own purposes; there has been a disregard of corporate, partnership, and limited liability formalities and a failure to maintain adequate minutes or records for and on behalf of the entity Defendants; Defendants have entered into transactions with each other that were not arm's-length transactions; and Defendants have the same or overlapping owners, shareholders, partners, members, directors, officers, and/or employees, as well as the same principal places of business.

13.    On information and belief, Defendants are the alter egos and agents of each other. Therefore, any wrongdoings and obligations of one Defendant are the wrongdoing and obligations of each and all of the other Defendants. Each of the Defendants are and should be held liable jointly and severally for each of the

other's conduct and liabilities alleged herein to avoid perpetrating a fraud or injustice.

14.     Defendants are coconspirators with one another. Each Defendant has liability for the tort claims alleged herein whether or not the Defendant actually committed the tort himself, herself, or itself. Each Defendant shared with the other Defendants a common plan or design in its perpetration. By participation in a civil conspiracy, each Defendant adopted as his, her, or its own the torts of the other Defendants. Each Defendant is jointly and severally liable with each of the other Defendants for the tort claims alleged herein irrespective of whether or not he, she, or it was a direct actor and regardless of the degree of his, her, or its activity.

15.     Plaintiff are informed and believe, and thereon allege, that at all relevant times each Defendant aided and abetted the other Defendants in their commission of the wrongful acts alleged in this complaint. Each Defendant knew that the wrongful acts alleged in this Complaint were being committed by the other Defendants against Plaintiffs. Each Defendant gave substantial assistance and encouragement to the other Defendants in furtherance of these alleged acts. Each Defendant's conduct was a substantial factor in causing harm to Plaintiffs.

**JURISDICTION**

16.     The United States District Court for the Southern District of California has subject matter jurisdiction because this action arises under the Securities Exchange Act of 1934, Chapter 4, Stat. 881, 15 U.S.C. § 78j and Securities and Exchange Commission Rule 10b-5 promulgated pursuant to the Act (17 C.F.R. § 240.10b-5) as more fully appears below. The district courts of the United States have exclusive jurisdiction of violations of the Securities Exchange Act of 1934 and the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by the Securities Exchange Act of 1934 and the rules and regulations thereunder. 15 U.S.C. § 78aa(a). The United States District Court for the Southern District of California has supplemental

jurisdiction to adjudicate the other claims pled herein because they are all so related to Plaintiffs' Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 claims that they form part of the same case or controversy. 28 U.S.C. § 1367.

## VENUE

17.     Venue is proper in the Southern District of California under 28 USC § 1391(b)(2) (Deering 2024) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in the Southern District of California, and a substantial part of property that is the subject of the action is situated in the Southern District of California. Venue is proper in the Southern District of California under 28 USC § 1391(c)(1) (Deering 2024) because the Defendants who are natural persons reside in the Southern District of California. Venue is proper in the Southern District of California under 28 USC § 1391(c)(2) (Deering 2024) because the entity Defendants are subject to the District Court for the Southern District of California's personal jurisdiction with respect to the civil action in question.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS
### Introduction

18.     This is a case of savvy businesspeople lying to a prominent plastic surgeon to persuade him to forfeit his $9 million medical practice in exchange for $1 million in cash, and securities in a venture worth nothing.

19.     Over 30 years, Dr. Lee built his plastic surgery practice into an enormous success.

20.     Defendants Chao and Scopetta claimed to be wealthy businesspeople each with a net worth of $60 million to $80 million dollars. Chao and Scopetta formed the company, Defendant Holdings, to acquire and combine multiple plastic surgery practices across the country. Defendants' model was to buy practices in exchange for equity interests in Holdings. Defendants had already acquired four

practices when they approached Dr. Lee. Chao and Scopetta claimed they had invested $10 million of their own money. Their promise was that when combined, the doctors' interests in Holdings would be worth far more than individual practices. The truth was the exact opposite.

21.    Chao and Scopetta's plan depended on buying practices at reasonable prices. They represented to Dr. Lee that any practices they bought would be at the same or lower multiple of earnings they were paying Dr. Lee. This was false. At the same time, they were already secretly negotiating to pay far higher multiples for other practices. Not only was this deceitful to Dr. Lee, overpaying for those other practices created a business that was unsustainable and ultimately crashed.

22.    Chao and Scopetta represented that Holdings was making $1 million a month. This was false. Holdings was actually losing money at an alarming rate.

23.    Chao and Scopetta valued Dr. Lee's practice at $9 million. They proposed that they and the other Defendants would buy Dr. Lee's practice for that price, $1.5 million in cash and $7.5 million in equity value in Holdings. They represented Dr. Lee's equity value in Holdings would be much greater than Dr. Lee's practice if kept separate. They required Dr. Lee to reduce his salary, and promised Dr. Lee's profits distributions from Holdings would greatly exceed his salary reduction. However, Dr. Lee in fact has received no profits at all from Holdings. For the sale of Dr. Lee's practice, Dr. Lee and his company, Inspiratio, received only about $1 million in cash, and a membership interest in Holdings worth nothing.

24.    Defendants promised that Dr. Lee and the other doctors whose practices were acquired by Defendants would be granted positions on the board of directors, providing them with full access to information and participation in decision making. None of that happened.

25.    This was not just a poor business outcome. Holdings' failure was directly caused by Chao and Scopetta's many deceits and catastrophic business

decisions. For example, Defendants overpaid for medical practices in direct contravention of what Defendants promised Dr. Lee, and which devastated any prospect of profitability and value. Defendants represented that Defendants had and would purchase world class administrative, accounting, HR, and information technology and computer processes that would dramatically reduce costs and add to earnings. However, Defendants' administrative decisions and processes were disastrous, greatly multiplying and exceeding the costs on a pro rata basis what Dr. Lee had been paying, and worse, resulted in terrible operations and inefficiencies.

26.    Defendants borrowed and guaranteed repayment of over $40 million that they could not repay, which has resulted in foreclosure, litigation, and loss of control.

27.    Defendants affirmatively concealed and did not disclose voluminous relevant information both before and after taking Dr. Lee's practice. They did not provide required financial reporting and directed their senior executive not to share information.

28.    The membership interests in Holdings that Defendants sold to Inspiratio were securities that were not registered with the Securities and Exchange Commission as required, and did not qualify for any exemption from registration. Defendants provided no private placement memorandum.

29.    The vision Defendants presented to Dr. Lee was for him to merge his valuable medical practice with viable, ongoing practices of other plastic surgeons, whose combined practices would then be worth more than the sum of their parts as individual practices. However, what transpired was Defendants seized Dr. Lee's medical practice, intwined it in unlicensed entities engaged in the illegal corporate practice of medicine, made devastatingly poor and deceptive business decisions, and deprived Dr. Lee of nearly all value for his own practice.

COMPLAINT

30.    Defendants' inducement of Dr. Lee to sell his valuable practice in exchange for an investment in Holdings was securities and common law fraud. Dr. Lee and his companies are entitled to rescission, treble damages, damages for breaches of fiduciary duties, and punitive damages. The sale should be adjudicated to be void because it has lead to the unlawful corporate practice of medicine.

**Plaintiffs' Medical Practice**

31.    Plaintiff Dr. Lee is a renowned, award-winning plastic surgeon in San Diego, California. He received his medical degree from University of California San Diego School of Medicine and has been in practice for more than 30 years. Dr. Lee is triple board certified in plastic surgery, general surgery, and hand surgery. For the last 16 years, Dr. Lee was named the Top Doctor in Plastic Surgery and recognized for his "Exceptional Excellence" in medicine by his peers, placing him within the top 4% of all San Diego doctors. Dr. Lee is one of only 48 doctors in San Diego who have ever had this honor and distinction for this many years. He has been named one of American's Best Physicians, a Real Self Top Doctor, and a Vitals Patients' Choice Award recipient, and Vitals 5 Year Honoree

32.    In 1994, Dr. Lee formed the corporation "Changes" in which to conduct his medical practice. Changes was named one of the Top 10 Breakout Aesthetic Companies, one of the top five Best Medical Spas in the San Diego A-List Awards, and Best Cosmetic Surgery Center in the Best of North Coast San Diego and named an InMode luminary for pioneering the Scarless Surgery technique — all in 2016 alone.

33.    Dr. Lee's medical practice including Changes is referred to herein as "**Dr. Lee's Practice**."

34.    In 2022, Dr. Lee and Changes sold all of Dr. Lee's Practice assets including goodwill to Defendants, as described herein.

COMPLAINT

**Defendants' Fraudulent Purchase of Dr. Lee's Practice**

35.    In or about November 2021, Chao approached Dr. Lee regarding the concept of a plastic surgery roll up model "which had never before been attempted." They met at Ruth's Chris for dinner and discussed the model.

36.    Chao represented that he had had massive success in a private equity real estate company known as Western Metal Investments he started with Scopetta, and grown each of their net worth to $60 million to $80 million within five to seven years. Chao represented he and Scopetta had connections to high finance and private equity capital.

37.    Dr. Lee and Chao subsequently had several more conversations to better understand the vision and plan. Scopetta also met with Dr. Lee in and around 2021 and 2022.

38.    Chao and Scopetta, each on their own behalf, on behalf of each other, and on behalf of the other Defendants, represented the following to Plaintiffs. Chao and Scopetta had formed Defendant Holdings for the purpose of acquiring plastic surgery practices and combining them into a single limited liability company, Holdings. The doctors would be owners and members in Holdings. The value of the practices together would be worth more than the sum of them if they remained individual practices. This increase in value would come in part because the individual practices could be acquired for a lower multiple of their earnings before interest, taxes, depreciation, an appreciation ("EBITDA") than the multiple that would apply to the EBITDA of the combined enterprise. Also, the EBITDA of the practices combined would be greater due to lower administrative costs and costs of supplies. Holdings had a world class accounting, management, and administrative system to make the doctor's practice life easier and allow surgeons to focus just on surgery. Chao and Scopetta had invested $10 million of their own money to capitalize Holdings, and had a $150 million line of credit. Defendants proposed to buy Dr. Lee's Practice. Included in their inducement to Plaintiffs of this model was:

1) a substantial buyout price for Dr. Lee's Practice of four times EBITDA. This would greatly exceed what the market would otherwise support for a standalone sale of a multiple of one to two times EBITDA; 2) Plaintiffs would receive ongoing quarterly distributions to make up for Dr. Lee reducing his salary. This smaller salary by Dr. Lee and other doctors whose practices Holdings acquired would allow a greater EBITDA for Holdings and for Holdings to grow faster; and 3) Plaintiffs would receive growth in equity in Holdings as the business grew. Dr. Lee and other doctors contributing their practices would be members of Holdings' board of directors. As a board member and founding member, Dr. Lee would be privy to everything that went on in the Holdings organization including finances and major business acquisition decisions. Dr. Lee would have a vote and a say in Holdings' business decisions. All the doctors would be paid on the same basis, i.e., with artificially lower salaries to boost the EBITDA of the group. None of this was true, and Defendants knew it.

39.    Scopetta, on behalf of the other Defendants, presented Dr. Lee with a capitalization table prepared by Defendants' MIT mathematician. The CAP table showed how Plaintiffs' equity would grow exponentially, as would Plaintiff's ongoing monthly and yearly distributions, as more practices joined. Scopetta explained how all physicians would take a lower salary and raise their EBITDA up so the holding company, Holdings, would show a higher EBITDA for valuation purposes. Plaintiffs and the other physician owners would have distributions from Holdings come back to them in proportion to the shares they owned in the company, with Plaintiffs eventually receiving approximately $5.7 million per year in distributions based on Plaintiffs' and other physicians' EBITDA contributions. Based on these and other representations, Chao and Scopetta induced Plaintiffs to take little cash up front, more ownership in Holdings, take a low salary for Dr. Lee, and increase Plaintiffs' equity value in Holdings by increasing its EBITDA.

CBLG

40.    Based on a valuation of four times EBITDA, Defendants valued Dr. Lee's Practice at $9 million. Defendants purchased Dr. Lee's Practice's medical assets at that price, $1.5 million in cash, and $7.5 million in equity in Holdings. Defendants represented they were not acquiring any other practices for any more than the multiple of four times EBITDA that was being paid for Dr. Lee's Practice. That representation was false.

41.    Defendants induced Plaintiffs to sell the assets of Dr. Lee's Practice to Defendants based on these and other representations.

42.    Dr. Lee, Changes, and Holdings executed a Contribution, Asset Purchase and Exchange Agreement dated March 18, 2022 ("**Contribution Agreement**"). A true and correct copy of the Contribution Agreement is attached hereto as **Exhibit A** and incorporated herein by reference. Scopetta executed the Contribution Agreement on behalf of Holdings.

43.    Pursuant to the Contribution Agreement, Dr. Lee and Changes sold and assigned to Holdings certain goodwill and intellectual property owned by Dr. Lee's Practice. The acquisition price was $1.5 million in cash, plus 45,694 Class A Units of membership interests of Holdings representing approximately 24.50% of the total outstanding Class A Units of Holdings which Defendants valued at $7.5 million. After adjustments, the amount of cash received by Dr. Lee and Changes was approximately $1,092,461.57.

44.    Inspiratio and Holdings executed a Subscription Agreement dated March 18, 2022 ("**Subscription Agreement**"). A true and correct copy of the Subscription Agreement is attached hereto as **Exhibit B** and incorporated herein by reference. Scopetta executed the Subscription Agreement on behalf of Holdings.

45.    Inspiratio and Holdings executed a Joinder Agreement ("**Joinder Agreement**") dated 2022. A true and correct copy of the Joinder Agreement is attached hereto as **Exhibit C** and incorporated herein by reference. Scopetta executed the Joinder Agreement on behalf of Holdings.

46.    Dr. Lee's company, Inspiratio, was granted the 45,694 Class A Units of membership interests of Holdings pursuant to the Subscription Agreement and Joinder Agreement.

47.    Dr. Lee, Changes, and PPS FA executed an Asset Purchase, Assignment and Assumption Agreement dated July 22, 2022 ("**Asset Purchase Agreement**"). A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit D** and incorporated herein by reference. Scopetta executed the Asset Purchase Agreement on behalf of PPSA FA. Dr. Lee and Changes sold and assigned to PPS FA certain tangible and other assets from Dr. Lee's Practice for a purchase price of one dollar ($1.00).

48.    Dr. Lee, Changes, and Associates executed a Medical Record Transfer Agreement dated July 18, 2022 ("**Medical Record Transfer Agreement**"). A true and correct copy of the Medical Transfer Agreement is attached hereto as **Exhibit E** and incorporated by reference herein. Chao executed the Medical Record Transfer Agreement on behalf of Associates. Dr. Lee and Changes sold and assigned to Associates the medical records from Dr. Lee's Practice for a purchase price of one dollar ($1.00).

49.    Dr. Lee and Holdings executed a Restrictive Covenant Agreement dated July 18, 2022 ("**Restrictive Covenant Agreement**"). A true and correct copy of the Restrictive Covenant Agreement is attached hereto as **Exhibit F** and incorporated herein by reference. Scopetta executed the Restrictive Covenant Agreement on behalf of Holdings.

50.    The Contribution Agreement, the Subscription Agreement, the Joinder Agreement, the Asset Purchase Agreement, the Medical Record Transfer Agreement, and the Restrictive Covenant Agreement are collectively referred to herein as the "**Sale Documents**."

51.    Dr. Lee and Associates executed a Professional Services Agreement dated March 18, 2022, which was amended by an Addendum to Professional

12

Services Agreement dated January 1, 2023 (collectively, "**PSA**"). Chao executed the PSA on behalf of Associates. Pursuant to the PSA, Dr. Lee agreed to provide professional medical services to Associates. The PSA is the subject of a separate arbitration proceeding being administered by JAMS, Reference # 5240002685.

52.    According to Holdings' Amended and Restated Limited Liability Company Agreement ("**Holdings Operating Agreement**"), the purpose of Holdings was to own all the membership interests of Management. Holdings did for a time own Management. On information and belief, Defendants used Management to provide management services and handle the cash flow of the individual medical practices Defendants acquired, including Dr. Lee's Practice.

**Failure of Defendants' Representations and Promises, and Defendants' Concealments.**

53.    Since acquisition of Dr. Lee's Practice, Defendants' representations have been revealed to be false, and nothing has gone as represented by Defendants, including without limitation, as follows.

    a.    Chao and Scopetta did not invest $10 million of their own funds in Holdings. They put in very little of their own money, and relied on the borrowings from White Oak, described below.

    b.    Defendants did not have a $150 million line of credit.

    c.    Rather than the Defendant entities having a positive cash flow of millions of dollars, the reverse was true. Defendants reported the bank balances of the entity Defendants steadily declined from approximately $10 million in December 2022, to approximately $1.5 million in July 2023. This was a decrease of approximately $1 million per month, indicating a negative cash flow of this same amount.

    d.    Defendants were paying much higher multiples for other medical practices, up to 10 to 20 times EBIDTA, and even 30 times free cash flow. Such valuations were excessive and unsustainable, and destroyed the ability of

13

Holdings to earn reasonable returns. In fact, Defendants were secretly negotiating to acquire other practices at EBITDA multiples higher than the maximum of the four multiple they represented to Plaintiffs, even while negotiating with Plaintiffs.

e.    Defendants lied to Plaintiffs, and stated that all other doctors would have similar compensation structures with low salaries which assured high EBITDA contributions to split with the group. In fact, Dr. Lee ended up with the lowest salary among all the 10 or 11 physicians recruited to join Holdings. Dr. Lee and Changes EBITDA was disproportionately higher than other practices acquired by Defendants.

f.    Plaintiffs have received no distributions or earnings from Holdings. Dr. Lee's salary reduction in exchange for Inspiratio's share of Holdings' EBITDA has not been recovered whatsoever.

g.    Defendants stated they would operate Holdings in a very fiscally conservative manner. However, Holdings did the opposite. Defendants either directly or through their subsidiaries purchased three or four failing med spas, all of which went out of business and caused negative cash flow. Defendants either directly or through their subsidiaries purchased plastic surgery practices that did not cash flow. Holdings increased operation expenses by 100% or more.

h.    Defendants, either directly or through their subsidiaries, committed to $900,000 per year in rent for four new spaces without occupying any of them. At least two of these spaces remain unoccupied after approximately four years, and are a negative drag on cash flow.

i.    Defendants' representation that the cost and effectiveness of administration would improve was false. Accounting services were not in place or anywhere near ready for acquisitions. The administrative process was slower and less efficient. Overhead increased many fold over previous costs as they had been incurred by Dr. Lee and Changes prior to their sale. IT and other administrative

COMPLAINT

costs rose disproportionately to a multiple of pre-sale levels. Accounting and HR functions were much more cumbersome and time-consuming.

j.     Defendants never made Dr. Lee or any of the other doctors who contributed their practices to Holdings board members of Holdings or any entity. Defendants kept secret from Plaintiffs the decisions made by Holdings including finances and major business acquisition decisions. Plaintiffs had no vote or say in Holdings' business decisions. Defendants made horrible and financially devastating decisions following their acquisition of Dr. Lee's Practice.

k.     Plaintiffs are informed and believe that to the extent there are or were cash flow and earnings from the doctor's practices in Holdings and Associates, Defendants channeled those amounts and more to Management. From July 2022 through September 2024, Associates transferred "management fees" to its "MCO,", i.e., Management, designated as "I/CO," i.e., inter-company, in the amount of approximately $9,205,341.00. This was approximately 46% of total revenue from the doctors' practices. This far exceeded customary management fees of 3% to 10% of revenue. The payments exceeded EBITDA by 30%. The payments were effectively a transfer of all available earnings, cash, and value from the medical practices to Management, including Dr. Lee's Practice. This is an example of the commingling and lack of separateness among the Defendants, and part of the basis for finding them to be alter egos of one another and coconspirators with one another. This is also an example of the illegal corporate practice of medicine by Defendants.

l.     Management borrowed approximately $40,960,744.76 from White Oak, as administrative agent and attorney in fact for various lenders ("**White Oak Loan**"). The interest rate on the White Oak Loan is approximately 15% per annum. Holdings guaranteed the White Oak Loan, and Holdings pledged as collateral its ownership of 100% of the membership interests in Management to White Oak to secure the White Oak Loan. The White Oak Loan was improvidently

1    borrowed, could not be and has not been repaid, is in default, and is subject to

2    enforcement by the lenders including litigation. This White Oak Loan and its

3    default severely compromised the ability of Holdings to operate profitably and meet

4    the objectives promised to Plaintiffs. On or about July 29, 2024, White Oak

5    conducted a foreclosure sale of Holdings' membership interests in Management in

6    which the lenders acquired all the membership interests in Management – the

7    company where all cash flow was being channeled – thereby destroying the primary

8    purpose and value of Holdings. In Scopetta's words, "White Oak is threatening to

9    destroy all of the goodwill of the Companies [Holdings and Management]."

10           m.    During the period when Dr. Lee was induced to sell Dr. Lee's

11    Practice, Defendants represented to Dr. Lee and the other doctors that they would

12    run their own practices in their discretion, and there would be no corporate

13    interference.  Despite those promises to all the doctors, non-medical personnel,

14    Scopetta and Holdings' COO David Hooston, made all operational decisions.

15    Decision making and control over the doctor's practices has at all relevant times

16    rested in non-medical personnel. For example, the non-medical personnel

17    determined how to handle workplace issues during the COVID shutdown, which

18    staff members got raises and who did not, and who got hired and who did not. Since

19    White Oak's foreclosure of the membership interests in Management, non-medical

20    personnel have forbidden the doctors from doing annual reviews of staff and

21    employees because White Oak has suspended reviews and raises. Therefore,

22    Defendants' channeling of essentially all cashflow and earnings from the medical

23    practices to Management, and the exercise of management and control of

24    Management by non-medical personnel, constituted and continues to constitute the

25    illegal corporate practice of medicine by Management. Cal. Bus. & Prof. Code

26    § 2400 *et seq.* (Deering 2024); Cal. Corp. Code § 13407 (Deering 2024); and

27    *Conrad v. Med. Bd.*, 48 Cal. App. 4th 1038, 1042-43 (1996).

28

CBLG

n.      Plaintiffs made numerous requests to Defendants for financial information such as financial reporting on a regular basis as is required in the Holdings Operating Agreement, CAP tables, and disclosure of membership interests in Holdings granted to other doctors diluting Plaintiff's equity position. Defendants refused to provide the requested information. Scopetta specifically instructed Holdings' COO, David Hooston, to withhold financial information from Plaintiffs and other doctors who were members of Holdings.

o.      Chao and Scopetta stated they were not taking salaries. However, they would not disclose financial reports to show whether they were taking salaries or how much. In fact, Scopetta was taking a salary from Holdings in direct contradistinction from his claims to Plaintiffs, other doctors in Holdings, and Chao himself.

p.      Defendants would not disclose when they were issuing membership interests to corporate officers or others; when they were raising capital and diluting members' interests; or at what price further money raise rounds were being carried out. Defendants kept Plaintiffs and other Holdings members completely in the dark to any of the status of their investment or equity stake value.

q.      When a sale of the company was being contemplated, Defendants refused to give Plaintiffs and the other doctors any meaningful financial data to help the doctors determine the value of their shares or whether the terms of the sale were favorable to the physician shareholders.

54.    Defendants' pattern and practice of deceptive and fraudulent conduct continued after the acquisition of Dr. Lee's Practice. Following are examples without limitation of such deceptive and fraudulent practices.

a.      The second tranche of the White Oak Loan was approximately $30,000,000. Approximately $18,000,000 of this second tranche was to be used to purchase a practice from Dr. David Kaufman. Prior to funding the second tranche, White Oak required that Defendants further capitalize the business with fresh funds

by infusing an additional $5,000,000 cash into Holdings. To make it appear that Defendants did so, on February 2, 2023, Defendants transferred $3,000,000 from Management (at that time wholly owned by Holdings) to a company owned and controlled by Chao and Scopetta, Western Metal OZ 1 LP ("**Western Metal**"). That same day, Western Metal then transferred $5,000,000 to Holdings on February 2, 2003, making it appear that Defendants had satisfied the cash infusion requirement. As it appeared to White Oak that Defendants had met its infusion requirement, on February 3, 2023, White Oak funded approximately $18,000,000 of the second tranche of the White Oak Loan to Dr. Kaufman for the purchase of his practice. On that same day, after receiving the approximately $18,000,000, Dr. Kaufman transferred $3,000,000 to Western Metal, using part of the loan proceeds *from White Oak*. Also on February 3, 2023, Western Metal transferred $3,000,000 *back* to Management. Thus, it was all a shell game. Defendants used White Oak's own $3,000,000 of loan proceeds distributed to Dr. Kaufman, laundered through Western Metal, and then transferred back to Management, to make it appear, fraudulently, that Defendants had infused $5,000,000 of new money into Holdings to qualify for the second tranche of $30,000,000 of the White Oak Loan. Defendants simply moved around money from one Defendant entity to another, and used White Oak's own loan proceeds. In fact, there was at most $2,000,000 new funding from Western Metal, not $5,000,000. Had Defendants not used this deceptive and fraudulent scheme, Defendants would not have qualified for the increase in borrowing of $30,000,000 from White Oak. Since then, Defendants have defaulted on the White Oak Loan, which has been a substantial cause of the demise of Holdings. This is an example of Defendants' pattern and practice of using fraudulent and deceptive practices. Furthermore, this shell game is another example of the commingling and lack of separateness among the Defendants, and part of the basis for finding them to be alter egos of one another and coconspirators with one another.



COMPLAINT

b.      As described above, Defendants, via Western Metal, infused at most $2,000,000 new capital into Holdings. Defendants issued Class A 16,588 membership units, or 5.16% of the total, in Holdings to Western Metal Investments 2, a company owned and controlled by Chao and Scopetta. Defendants valued these new units at $6,683,546. They should have been valued, at most, at $2,000,000.

c.      Plaintiffs continued to make false statements to Plaintiffs after the sale. For instance, in approximately July 2023, when Holdings was in financial trouble with a falling and dangerously low cash balance, poor EBITDA performance of Holdings practices other than Dr. Lee's Practice, and bloated and wasteful corporate expenses, Dr. Lee held a meeting with the Defendants in San Diego to try to "right the ship" or to allow the Plaintiffs off the sinking ship. Defendants promised Plaintiffs to full disclosure of the financial situation to all the "Board Members" (the Physician owners) at the "Board" meeting the following week to problem solve the situation and get cooperative help from all the practices. Defendants convened a meeting. However, Defendants did not make any disclosure to the doctors/members of Holdings about Holdings' dire financial situation; no problems were shared; no corrective actions were taken; no accountability for failing performance was taken. Six months later, Associates and one of its practice subsidiaries, PPS Group San Diego Corp. dba Prime Plastic Surgery & MedSpa, filed bankruptcy petitions.

55.     Contrary to Defendants' representations, and due to Defendants' disastrous decision making before and after the sale of Dr. Lee's Practice, Inspiratio's membership interests in Holdings were and are worth nothing. Holdings' membership interests in Management have been lost by foreclosure sale to White Oak. The cash generated by the medical practices has been funneled to Management and White Oak. Plaintiffs did not receive fair value for Dr. Lee and Changes practice, or anywhere close.

56.    As a result of these misrepresentations plaintiffs have suffered well in excess of $7 million to $9 million loss in value of the practice transferred and profits.

<strong>FIRST CLAIM FOR RELIEF</strong>

<strong>VIOLATION OF SECURITIES EXCHANGE ACT OF 1934 AND SECURITIES AND EXCHANGE COMMISSION RULE 10b-5 — FALSE REPRESENTATIONS AND CONCEALMENT AGAINST ALL DEFENDANTS</strong>

57.    Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

58.    At all times material to this action, the Defendants, in person or through their employees or agents, communicated to the Plaintiffs certain Representations as described herein through the use of the United States mail and interstate telephone in interstate commerce, and these Representations were made to induce and consummate certain unlawful Representations and schemes and business fraud on the Plaintiffs.

59.    The Defendants, in person or through their employees or agents, contacted each of the Plaintiffs on many occasions in order to induce the Plaintiffs to sell and assign Dr. Lee's Practice to Holdings in exchange in part for membership interests in Holdings to be granted to Dr. Lee's limited liability company, Inspiratio. Pursuant to the requirements of 15 U.S.C. § 78u-4(b)(1), Plaintiffs alleges that the Defendants made the following false or misleading statements (collectively, "**Representations**"):



COMPLAINT

| Untrue or Misleading Statements | Reasons Why Statement False or Misleading |
|---|---|
| a. Defendants Chao and Scopetta had invested $10 million of their own money in Holdings. | a. Defendants Chao and Scopetta had invested little or none of their own money in Holdings. |
| b. Defendants had a $150 million line of credit. | b. Defendants had no line of credit. |
| c. The Defendant entities were making $1 million a month. | c. The Defendant entities were losing money at an alarming rate. |
| d. Defendants were buying other medical practices at no more than the four times EBITDA that they promised to pay Plaintiffs. | d. Defendants were buying other medical practices for far more than four times EBITDA, up to 10 to 20 times EBIDTA, and even 30 times free cash flow, of those other practices. |
| e. Defendants had world-class accounting, HR, computers, and other administrative resources and practices that would save the doctors time and reduce administrative expenses. | e. Defendants' administrative resources were inefficient and ineffective, and Defendants' administrative decisions and processes were disastrous, greatly multiplying and exceeding the costs on a pro rata basis that Dr. Lee had been paying for administrative resources, resulting in terrible operations and inefficiencies. |
| f. The original Holdings practice, Prime Plastic Surgery, San Diego. had a positive existing annual EBITDA of $1,500,000 to $2,000,000. | f. Plaintiffs are informed and believe Prime Plastic Surgery, San Diego had a negative EBITDA of approximately $1,500,000 per year. |

COMPLAINT

| Untrue or Misleading Statements | Reasons Why Statement False or Misleading |
|---|---|
| g. Dr. Lee's salary reduction would be more than made up for in profits from Holdings. Plaintiffs would eventually receive approximately $5.7 million per year in distributions. | g. Plaintiffs have never received any profits or cash distributions from Holdings. |
| h. Dr. Lee and the other doctors who contributed their practices to Holdings would be members of Holdings' board of directors, would be privy to everything that went on in the Holdings organization including finances and major business acquisition decisions, and would have a vote and a say in Holdings' business decisions. | h. Defendants never made Dr. Lee, or any of the other doctors who contributed their practices to Holdings members of Holdings' board of directors, made them privy to what went on the Holdings organization, or granted them any vote or say in Holdings' business decisions. |
| i. All doctors other than Dr. Lee had and would have similar compensation structures with low salaries which ensured high EBITDA contributions to split with the group. | i. Dr. Lee ended up with the lowest salary among all the 10 or 11 physicians recruited to join Holdings. Dr. Lee and Changes; EBITDA was disproportionately larger than the other practices. |

COMPLAINT

| Untrue or Misleading Statements | Reasons Why Statement False or Misleading |
|---|---|
| j. Scopetta represented the Holdings membership interests sold to Inspiratio and others were worth par, and therefore Inspiratio's interest was worth at least $7.5 million at the time Defendants induced Plaintiffs to invest. Later, Scopetta represented Inspiratio's interest was worth $18,410,956. | j. Inspiratio's membership interest in Holdings was always worthless. This was demonstrated in part by Defendants' attempt to sell Holdings in 2023. The prospective buyer, after doing due diligence, concluded the interests in Holdings were worthless. |
| k. Plaintiffs' equity interest in Holdings would be worth far more than Dr. Lee's Practice was worth standing alone. | k. Plaintiffs' equity interest in Holdings was worth far less than Dr. Lee's Practice was worth standing alone, and in fact, was worth nothing. |

60.    The Representations were material.

61.    The Representations had no other purpose than to induce the Plaintiffs to invest with the Defendants. Thus, the false or misleading Representations were made to the Plaintiffs by the Defendants with the intention that the Plaintiffs should rely on these Representations.

62.    While Defendants were inducing Plaintiffs to sell Dr. Lee's Practice, Defendants concealed the following facts from Plaintiffs ("**Concealed Facts**").

a.    The Defendant entities' true and correct financial condition.

b.    The amounts of their own funds, if any, that Chao and Scopetta contributed to Holdings.

c.    Compensation paid to Chao and Scopetta.

d.    The issuance of membership interests to corporate officers or others; the raising of capital and diluting members' interests; and at what price further money raise rounds were being carried out.

COMPLAINT

e.    The prices and multiples of EBITDA that Defendants were paying for medical practices other than Dr. Lee and Changes'.

f.    Defendants' purchases of failing med spa businesses and locations, on information and belief with a negative cash flows of approximately $1.5 million per year.

g.    The salary structures of other doctors who contributed their practices to Holdings.

h.    The EBITDA contributions of other doctors who contributed their practices to Holdings.

i.    The failure of Defendants to hold accountable the doctors in other practices that were producing results below expectations including negative cash flow.

j.    Cash transfers between and among Defendants.

k.    The operational interrelationship between and among Defendants.

l.    Defendants transferring cash and other assets to Management in excess of customary and ordinary management fees.

63.    Defendants intentionally concealed the Concealed Facts from Plaintiffs. Plaintiffs were unaware of the Concealed Facts and would not have acted as they did if they had known the Concealed Facts, including without limitation by Plaintiffs entering into the Sale Documents, and Dr. Lee and Changes selling Dr. Lee's Practice to Holdings.

64.    Defendants failed to fulfill on their Representations and promises to Plaintiffs including without limitation by failing to provide Plaintiffs profits greater than the amount Dr. Lee reduced his income, failing to provide Plaintiffs equity interests that along with the initial downpayment came anywhere close to the value of Dr. Lee's Practice assigned to Holdings, failing to make Dr. Lee a board member of Holdings or any entity, overpaying for other medical practices, overpaying for

CBLG

administrative expenses, overborrowing the White Oak loan with no reasonable means to repay, making Holdings a guarantor of the White Oak Loan, channeling the cash and earnings from the doctors' practices to Management, pledging Holdings' membership interests in Management which were then lost in the foreclosure sale because of defaults on the White Oak Loan, and failure to provide financial information to Plaintiffs including without limitation what is required by Holdings' Operating Agreement.

65.     Defendants provided no private placement memorandum to Defendants with respect to Holdings' membership interests.

66.     The membership interests in Holdings sold by Defendants to Plaintiffs were "securities" under federal and state law. Every offer and sale of securities must either be registered under the Securities Act of 1933 and with any similar state securities regulation commission, or rely on an available exemption from registration. Holdings' membership interests were not registered. Plaintiffs are informed and believe no exemption from registration applied to issuance of Holdings' membership interests.

67.     Defendants' acts and omissions alleged herein constituted a violation of Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"). Defendants' acts and omissions were the employment of a device, scheme, and artifice to defraud Plaintiffs. Defendants made the Representations, and concealed the Concealed Facts which were necessary in order to make the Representations, in the light of the circumstances under which they were made, not misleading. Defendants acts and omissions were a practice and course of business which operated as fraud and deceit upon Plaintiffs.

68.     The violations of Rule 10b-5 took place in connection with the sale of securities, to wit, membership interests in Holdings. To the extent Defendants made false and misleading statements to Plaintiffs, and concealed material facts from

CBLG

COMPLAINT

Plaintiffs, after the sale of the membership interests in Holdings, it was part of an ongoing scheme that began and took place before the sale, and continued thereafter.

69.     Plaintiffs relied on Defendants' violation of Rule 10b-5 and Defendants acts and omissions that constituted a violation of Rule 10b-5. Such reliance included without limitation Plaintiffs' selling of Dr. Lee's Practice, entering into the Sale Documents, and giving up their profits in their medical practice.

70.     Defendants acted with the state of mind or scienter that at the time that the Defendants made the false or misleading Representations described above, they knew that they were false.

71.     Plaintiffs suffered loss. Plaintiffs lost profits that they would have earned from Dr. Lee's Practice had they not sold it to Holdings, and Plaintiffs did not receive fair value for Dr. Lee's Practice.

72.     As a result of the matters alleged above, the Plaintiffs have been damaged in an amount presently unknown but will be proven at trial.

73.     As a result of Defendants' fraudulent misrepresentations and concealments, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

74.    In the alternative, Plaintiffs are entitled to recover as damages from each and all of the Defendants, jointly and severally, the full market value of Plaintiffs' medical practice that was assigned and sold to Defendants, or the profits Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is greater, offset only by the cash consideration received by $1,092,461.57.

75.    Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

76.    Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAW OF 1968 AGAINST ALL DEFENDANTS

77.    Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

78.    Defendants acts and omissions alleged herein including without limitation making the Representations and concealing the Concealed Facts were a violation of the California Corporate Securities Law of 1968, California Corporations Code §§ 25000 – 25707. Such conduct constituted fraudulent and prohibited practices under § 25401.

79.    As a result of Defendants' fraudulent misrepresentations and concealments, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee

and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

80.    In the alternative, Plaintiffs are entitled to recover as damages from each and all of the Defendants, jointly and severally, the full market value of Plaintiffs' medical practice that was assigned and sold to Defendants, or the profits Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is greater, offset only by the cash consideration received by $1,092,461.57.

81.    Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

82.    Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**

**TREBLE DAMAGES**

**CALIFORNIA PENAL CODE § 496**

**AGAINST ALL DEFENDANTS**

83.    Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

84.    "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail …" Cal. Penal Code § 496(a).

85.    "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees." Cal. Penal Code § 496(c).



COMPLAINT

86.     "[T]reble damages and attorney's fees are available under section 496(c) when, as here, property has been obtained in any manner constituting theft … ." *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 339 (2002) (quotation marks omitted). "Theft" includes taking property by "false or fraudulent representation or pretense." *Bell v. Feibush,* 212 Cal.App.4th at 1047-1048 (2013), quoting § 484(a), endorsed by the California Supreme Court, *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th at 350, 361.

87.     Defendants bought and received Dr. Lee's Practice's assets, and all profits and cash flow from Dr. Lee's Practice since the time of the sale, by false or fraudulent representation or pretense as alleged herein.

88.     Dr. Lee's Practice's assets sold to Defendants, and all profits and cash flow from Dr. Lee's Practice since the time of the sale, are "property" under California Penal Code § 496(a).

89.     Plaintiffs were damaged by the loss of Dr. Lee's Practice's assets and all profits and cash from Dr. Lee's Practice since the time of the sale to Defendants.

90.     Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, three times the amount of Plaintiffs' damages.

91.     Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

92.     Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

### FRAUD – INTENTIONAL MISREPRESENTATION

### AGAINST ALL DEFENDANTS

93.     Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

94.     In or about November 2021 through July 2022, Defendants represented the Representations were true**.**

29

COMPLAINT

95.    The Representations were important to Plaintiffs.

96.    The Representations were false.

97.    Defendants knew the Representations were false. In the alternative, Defendants made the Representations recklessly and without regard for their truth.

98.    To the extent the Representations were expression of an opinion or a speculation about future events, they were made with the intent to deceive. Defendants claimed to have special knowledge about the subject matter that Plaintiffs did not have. Defendants made the Representations, not as a casual expression of belief, but in a way that declared the matter to be true. Defendants had a relationship of trust and confidence with Plaintiffs because Defendants were inducing Plaintiffs to assign Dr. Lee's Practice to Holdings. For this same reason, Defendants had a special reason to expect that Plaintiffs would rely on Defendants' opinions.

99.    Defendants intended that Plaintiffs rely on the Representations.

100.    Plaintiffs reasonably relied on the Representations. Such reliance included without limitation Plaintiffs entering into the Sale Documents, and Dr. Lee and Changes selling Dr. Lee's Practice to Defendants.

101.    Plaintiffs were harmed.

102.    Plaintiffs' reliance on the Representations was a substantial factor in causing harm to Plaintiffs.

103.    As a result of Defendants' fraudulent misrepresentations, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally,

damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

104.   In the alternative, Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, the full market value of Dr. Lee's Practice that was assigned and sold to Defendants, or the profits Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is greater, offset only by the cash consideration received by $1,092,461.57.

105.   Plaintiffs are entitled to recover punitive and exemplary damages from each and all of the Defendants.

106.   Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

107.   Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**

**FRAUD – FALSE PROMISE**

**AGAINST ALL DEFENDANTS**

108.   Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

109.   In or about November 2021 through July 2022, Defendants Chao and Scopetta, each on their own behalf and on behalf of the other Defendants made the following promises to Plaintiffs ("**Promises**").

a.      Defendants would not buy other medical practices at more than four times EBITDA they promised to pay Plaintiffs.

b.      Defendants would pay Dr. Lee in the form of profits from Holdings far more than the amount he was reducing his salary.

c.      Defendants had and would purchase and use world class administrative, accounting, HR, and information technology and computer resources and processes that would dramatically reduce costs and add to earnings.

d.      Dr. Lee and the other doctors who contributed their practices to Holdings would be members of Holdings' board of directors, would be privy to everything that went on in the Holdings organization including finances and major business acquisition decisions, and would have a vote and a say in Holdings' business decisions.

110.   Defendants did not intend to perform the Promises when they made them.

111.   Defendants intended Plaintiffs to rely on the Promises.

112.   Plaintiffs reasonably relied on the Promises. Such reliance included without limitation Plaintiffs entering into the Sale Documents, and Dr. Lee and Changes selling Dr. Lee's Practice to Defendants.

113.   Defendants did not perform the acts promised in the Promises.

114.   Plaintiffs were harmed.

115.   Plaintiffs' reliance on Defendants' Promises was a substantial factor in causing Plaintiffs' harm.

116.   As a result of Defendants' false promises, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able

1   to restore their profits to what they would have been had they not sold Dr. Lee's

2   Practice to Defendants.

3       117.   In the alternative, Plaintiffs are entitled to recover as damages from

4   each and all of the Defendants, jointly and severally, the full market value of

5   Plaintiffs' medical practice that was assigned and sold to Defendants, or the profits

6   Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is

7   greater, offset only by the cash consideration received by $1,092,461.57.

8       118.   Plaintiffs are entitled to recover punitive and exemplary damages from

9   each and all of the Defendants.

10      119.   Plaintiffs are entitled to recover prejudgment interest from each and all

11  of the Defendants, jointly and severally.

12      120.   Plaintiffs are entitled to recover from each and all of the Defendants,

13  jointly and severally, Plaintiffs' attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**

**FRAUD – CONCEALMENT**

**(Against All Defendants)**

17      121.   Plaintiffs incorporate all other paragraphs in this complaint by

18  reference as if fully restated herein.

19      122.   Defendants concealed the Concealed Facts from Plaintiffs.

20      123.   Defendants were under a duty to disclose the Concealed Facts to the

21  Plaintiffs because Defendants were inducing Dr. Lee and Changes to sell and assign

22  their valuable medical practice to Defendants.

23      124.   Defendants intentionally concealed or suppressed the Concealed Facts

24  with the intent to defraud Plaintiffs.

25      125.   Plaintiffs were unaware of the Concealed Facts and would not have

26  acted as they did if they had known the Concealed Facts, including without

27  limitation by Plaintiffs entering into the Sale Documents, and Dr. Lee and Changes

28  selling their valuable medical practice to Holdings.



33

126.   Plaintiffs sustained damage or harmed.

127.   Defendants' concealment or suppression of the Concealed Facts was a substantial factor in causing Plaintiffs' harm or damages.

128.   As a result of Defendants' fraudulent concealment, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

129.   In the alternative, Plaintiffs are entitled to recover as damages from each and all of the Defendants, jointly and severally, the full market value of Plaintiffs' medical practice that was assigned and sold to Defendants, or the profits Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is greater, offset only by the cash consideration received by $1,092,461.57.

130.   Plaintiffs are entitled to recover punitive and exemplary damages from each and all of the Defendants.

131.   Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

132.   Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

## NEGLIGENT MISREPRESENTATION

## AGAINST ALL DEFENDANTS

133.   Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

134.   Defendants represented to Plaintiffs the Representations were true.

135.   The Representations were important to Plaintiffs.

136.   The Representations were false.

137.   Defendants had no reasonable grounds for believing the Representations were true when they made them.

138.   Defendants claimed to have special knowledge about the subject matter that Plaintiffs did not have. Defendants made the Representations, not as a casual expression of belief, but in a way that declared the matter to be true. Defendants had a relationship of trust and confidence with Plaintiffs because Defendants were inducing Plaintiffs to assign Dr. Lee and Changes' valuable medical practice to PGA. For this same reason, Defendants had a special reason to expect that Plaintiffs would rely on the Defendant's opinion.

139.   Defendants intended that Plaintiffs rely on the Representations.

140.   Plaintiffs reasonably relied on the Representations. Such reliance included without limitation Plaintiffs entering into the Sale Documents, and Dr. Lee and Changes selling their valuable medical practice to Holdings.

141.   Plaintiffs were harmed.

142.   Plaintiffs' reliance on the Representations was a substantial factor in causing harm to Plaintiffs.

143.   As a result of Defendants' negligent misrepresentations, Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages

adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

144.   In the alternative, Plaintiffs are entitled to recover as damages from each and all of the Defendants, jointly and severally, the full market value of Plaintiffs' medical practice that was assigned and sold to Defendants, or the profits Dr. Lee's Practice would have earned had they not sold it to Holdings, whichever is greater, offset only by the cash consideration received by $1,092,461.57.

145.   Plaintiffs are entitled to recover prejudgment interest from each and all of the Defendants, jointly and severally.

146.   Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF
## RESCISSION
## CALIFORNIA CIVIL CODE § 1689
## AGAINST ALL DEFENDANTS

147.   Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

148.   Plaintiff's consent to the Sale Documents and the sale of Dr. Lee's Practice to Holdings was obtained through fraud exercised by or with the connivance of Defendants as alleged herein. Cal. Civ. Code § 1689(b)(1).

COMPLAINT

149.   The consideration for the obligations of Plaintiffs under the Sale Documents failed, in whole and in material part, through the fault of Defendants. § 1689(b)(2).

150.   The consideration for the obligations of Plaintiffs under the Sale Documents became void. § 1689(b)(3).

151.   The consideration for the obligations of Plaintiffs under the Sale Documents, before it was rendered to Plaintiffs, failed. § 1689(b)(4).

152.   The Sale Documents, and each of them, are unlawful for causes which do not appear in their respective terms or conditions because they violate applicable federal and state securities laws, Defendants' operation, and now White Oak's operation of Dr. Lee's Practice under the Sale Documents constitutes the illegal corporate practice of medicine, and the parties are not equally at fault. § 1689(b)(5).

153.   The public interest will be prejudiced by permitting the Sale Documents to stand because they violate federal and state securities' laws, and facilitate the illegal corporate practice of medicine. § 1689(b)(6).

154.   Plaintiffs are entitled to and hereby do rescind each and all of the Sale Agreements. Plaintiffs are ready, willing and able to return to Defendants the benefits Plaintiffs received under the Sale Agreements, i.e., $1,092,461.57 minus offset by the amount of damages adjudicated to be owed by Defendants to Plaintiffs, and Inspiratio's membership interests in Holdings, upon entry of judgment final after all appeals adjudicating the rescission of the Sale Agreements. In addition to rescission, Plaintiffs are also entitled to recover from each and all of the Defendants, jointly and severally, damages for lost profits from the time Dr. Lee and Changes sold and assigned to Defendants Dr. Lee's Practice's assets until the time Dr. Lee and Changes are able to restore their profits to what they would have been had they not sold Dr. Lee's Practice to Defendants.

155.   Plaintiffs are entitled to recover from each and all of the Defendants, jointly and severally, Plaintiffs' attorneys' fees and costs.



COMPLAINT

**NINTH CLAIM FOR RELIEF**

**BREACH OF FIDUCIARY DUTY**

**AGAINST DEFENDANTS CHAO AND SCOPETTA**

156.   Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

157.   Chao and Scopetta are the managers of Holdings. Inspiratio was admitted as a member of Holdings in exchange for the sale of Dr. Lee's Practice to Defendants. As such, Chao and Scopetta owe fiduciary duties to Plaintiffs.

158.   Chao and Scopetta have breached their fiduciary duties to Plaintiffs by making the following management decisions for Holdings including without limitation.

a.      Transferring sustantially all of the cash and earnings from the medical practices to Management.

b.      Comingling funds between and among Defendants.

c.      Failing to provide financial reporting to Plaintiffs, both as enumerated in Holdings' Operating Agreement, and as otherwise obligated to keep Inspiratio reasonably informed.

d.      Borrowing the White Oak Loan that Defendants could not repay.

e.      Borrowing the White Oak Loan using fraudulent and deceptive practices to mislead White Oak into believing Defendants had infused $5,000,000 of new cash into Holdings, which was false.

f.      Causing Holdings to guarantee the White Oak Loan and pledge all of its membership interests in Management as collateral for the White Oak Loan, which have now been lost to White Oak in the foreclosure sale.

g.      Overpaying for medical practices including without limitation by failing to verify the true EBITDA of the practices purchased to assure sustainable EBITDA post purchase.



COMPLAINT

h.    Acquiring resources and implementing practices for Holdings' accounting, IT, marketing, and human resource functions that were ineffective and inefficient.

i.    Overpaying for Holdings' software and other resources for accounting, IT, marketing, and human resource functions.

j.    Dramatically increasing Holdings' overhead costs.

k.    Failing to control Holdings' costs.

l.    Failing to hold doctors whose practices were acquired by Defendants accountable for the profitability of their practices.

m.    Leasing four medical office spaces and then leaving them vacant.

n.    Purchasing three or four medical spas, all of which were failing, and incurring negative cash flow from them until they were abandoned.

o.    Acquiring and continuing to run Prime Plastic Surgery San Diego, a member practice of Holdings in negative cash flow from inception to present without any significant improvement in its financial performance.

p.    Operating Holdings and Management in a way that constituted the illegal corporate practice of medicine.

159.   As a result of Chao and Scopetta's breaches of fiduciary duty, Plaintiffs have been damaged in amounts presently unknown but will be proven at trial.

160.   Plaintiffs are entitled to recover compensatory damages from Chao and Scopetta, jointly and severally.

161.   Plaintiffs are entitled to recover punitive and exemplary damages from Chao and Scopetta.

162.   Plaintiffs are entitled to recover prejudgment interest from Chao and Scopetta, jointly and severally.

COMPLAINT

163.   Plaintiffs are entitled to recover from Chao and Scopetta, jointly and severally, Plaintiffs' attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

## DECLARATORY RELIEF – UNLAWFUL CORPORATE PRACTICE OF MEDICINE

## AGAINST ALL DEFENDANTS

164.   Plaintiffs incorporate all other paragraphs in this complaint by reference as if fully restated herein.

165.   The purported sale to Defendants by Dr. Lee and Changes of their goodwill, and the other assets of Dr. Lee's Practice, was void and unlawful under California under California Business & Professions Code § 2400 *et seq.* (Deering 2024) (corporate practice of medicine is unlawful), and under California Corporations Code § 13407 (Deering 2024) (sale of professional corporation to unlicensed individuals is void).

166.   The Restrictive Covenant Agreement contains provisions in which the purpose and function is to restrain Dr. Lee and from engaging in a lawful profession, trade, or business, to wit, the practice of medicine. "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void. This section shall be read broadly, in accordance with *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter." Cal. Bus. & Prof. Code § 16600(a) and (b)(1) (Deering 2024). The Restrictive Covenant Agreement is void and unenforceable under § 16600, *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937 (2008), and other applicable law. The exception of § 16601 for sale by a person who sells the goodwill of a business, his or her

ownership interest in a business entity, or the assets of a business entity, does not apply because the sale of Dr. Lee's Practice was void and unlawful as stated herein.

167.   A dispute has arisen and now exists between Plaintiffs and Defendants. Plaintiffs contend that: (1) the purported sale of Dr. Lee's Practice and each of the Sale Documents are void *ab initio* because they resulted in the illegal corporate practice of medicine and a sale to unlicensed individuals; and (2) the Restrictive Covenant Agreement is separately void and unenforceable because it is an illegal restraint on Dr. Lee from practicing medicine.

168.   Plaintiffs are informed and believe Defendants deny these contentions.

169.   Plaintiffs seek a declaratory judgment of their contentions stated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant, jointly and severally, as follows:

**For the First Claim for Relief:**

1. A judgment that the Dr. Lee's Practice was procured by Defendants by a material misrepresentation, contrary to the provision of the Securities Exchange Act of 1934, Chapter 4, Stat. 881, 15 U.S.C. § 78j, and Rule 10b-5, promulgated pursuant to the Act (17 C.F.R., § 240.10b-5);

2. Rescission of the Sale Documents;

3. Compensatory damages according to proof;

4. Prejudgment interest;

5. Plaintiffs' attorneys' fees and costs;

6. Such other relief as the Court may determine to be just and proper.

**For the Second Claim for Relief:**

1. A judgment that the Dr. Lee's Practice was procured by Defendants by a material misrepresentation, contrary to the

41

COMPLAINT

provision of California Corporate Securities Law of 1968, California Corporations Code §§ 25000 – 25707;

2. Rescission of the Sale Documents;

3. Compensatory damages according to proof;

4. Prejudgment interest;

5. Plaintiffs' attorneys' fees and costs;

6. Such other relief as the Court may determine to be just and proper.

**For the Third Claim for Relief:**

1. Compensatory damages in the amount of three times Plaintiffs' actual damages according to proof;

2. Prejudgment interest;

3. Plaintiffs' attorneys' fees and costs;

4. Such other relief as the Court may determine to be just and proper.

**For the Fourth Claim for Relief:**

1. Rescission of the Sale Documents;

2. Compensatory damages according to proof;

3. Punitive and exemplary damages;

4. Prejudgment interest;

5. Plaintiffs' attorneys' fees and costs;

6. Such other relief as the Court may determine to be just and proper.

**For the Fifth Claim for Relief:**

1. Rescission of the Sale Documents;

2. Compensatory damages according to proof;

3. Punitive and exemplary damages;

4. Prejudgment interest;

5. Plaintiffs' attorneys' fees and costs;

6. Such other relief as the Court may determine to be just and proper.

COMPLAINT

**For the Sixth Claim for Relief:**

      1.  Rescission of the Sale Documents;

      2.  Compensatory damages according to proof;

      3.  Punitive and exemplary damages;

      4.  Prejudgment interest;

      5.  Plaintiffs' attorneys' fees and costs;

      6.  Such other relief as the Court may determine to be just and proper.

**For the Seventh Claim for Relief:**

      1.  Rescission of the Sale Documents;

      2.  Compensatory damages according to proof;

      3.  Prejudgment interest;

      4.  Plaintiffs' attorneys' fees and costs;

      5.  Such other relief as the Court may determine to be just and proper.

**For the Eighth Claim for Relief:**

      1.  Rescission of the Sale Documents;

      2.  Compensatory damages according to proof;

      3.  Prejudgment interest;

      4.  Plaintiffs' attorneys' fees and costs;

      5.  Such other relief as the Court may determine to be just and proper.

**For the Ninth Claim for Relief:**

      1.  Compensatory damages according to proof;

      2.  Punitive and exemplary damages;

      3.  Prejudgment interest;

      4.  Plaintiffs' attorneys' fees and costs;

      5.  Such other relief as the Court may determine to be just and proper.

**For the Tenth Claim for Relief:**

      1.  A declaratory judgment that the sale of Dr. Lee's Practice and each of the Sale Documents are void *ab initio*;

COMPLAINT

2. A declaratory judgment that the Restrictive Covenant Agreement is separately void and unenforceable;

3. Plaintiffs' attorneys' fees and costs;

4. Such other relief as the Court may determine to be just and proper.

DATED: <u>December 9, 2024</u>          CALIFORNIA BUSINESS LAW GROUP, PC

By: /s/*Duane S. Horning*
          DUANE S. HORNING
Attorneys for Plaintiffs GILBERT W. LEE, M.D.; CALIFORNIA INSTITUTE OF PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL CORPORATION, a California corporation dba Changes Plastic Surgery & Spa; and INSPIRATIO LLC, a California limited liability company

COMPLAINT

1

**DEMAND FOR JURY TRIAL**

Plaintiffs GILBERT W. LEE, M.D.; CALIFORNIA INSTITUTE OF PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL CORPORATION, a California corporation dba Changes Plastic Surgery & Spa; and INSPIRATIO LLC, a California limited liability company, each hereby demand a jury trial on all issues triable by a jury in this matter.

DATED: December 9, 2024          CALIFORNIA BUSINESS LAW GROUP, PC

By:  /s/*Duane S. Horning*
DUANE S. HORNING
Attorneys for Plaintiffs GILBERT W. LEE, M.D.; CALIFORNIA INSTITUTE OF PLASTIC AND RECONSTRUCTIVE SURGERY, A MEDICAL CORPORATION, a California corporation dba Changes Plastic Surgery & Spa; and INSPIRATIO LLC, a California limited liability company

CBLG

COMPLAINT